IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| **JESUS EMMANUEL JEHOVAH,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:14CV00538 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **HAROLD W. CLARKE, ET AL.,** | ) | By: James P. Jones |
| | ) | United States District Judge |
| Defendants. | ) | |

*Jesus Emmanuel Jehovah, Pro Se Plaintiff.*

Plaintiff Jesus Emmanuel Jehovah, a Virginia inmate proceeding pro se, filed this civil rights complaint alleging that prison officials have violated his constitutional and state law rights related to his personal property and access to courts. Based on the nature of his claims, the court construed and docketed his submissions as a civil rights action under 42 U.S.C. § 1983. After review of Jehovah's 61-page, single-spaced complaint, I conclude that his allegations do not provide a factual or legal basis for any claim of constitutional significance and will, therefore, dismiss the action without prejudice.

I.

A. Personal Property.

Jehovah's troubles with his personal property began in late June 2013 at Sussex II State Prison. Jehovah had been in Virginia Department of Corrections

("VDOC") custody since January 2004, housed at four different facilities. During that time, as permitted under VDOC regulations, he had accumulated 14 books and numerous envelopes containing documents, among other personal property items. On June 27, 2013, Sussex II property officers Turner and Webb came to Jehovah's cell and notified him that he was being transferred to another VDOC prison. They directed him to move all of his personal property items from his cell to carts they had brought to the cell block.

Because the unit was on lock-down, all other inmates remained locked in their cells during this transfer. Jehovah complied, but in so doing, he set aside certain books and legal materials, religious materials, and medical records. He told Turner and Webb that because of health concerns and pending lawsuits, he needed these items to be placed in the one box of property ("the free box") to be transported with him, free of charge, to the new facility, per VDOC policy. The officers agreed and loaded the items designated into Jehovah's orange mesh commissary bag to keep them separated from his other property on the carts.

Policy provided that Jehovah could designate disposition of his remaining property items. Jehovah, who was indigent, signed a form directing that his items should be shipped to him at the new facility. He also signed a money withdrawal form; he believed that by completing this form, he had consented to a "shipping cost loan" under Operating Procedure ("OP") 802.1(V)(G)(5)(c), that he could

repay through installments withheld from his inmate trust account as funds became available. Webb and Turner then took the forms and the carts to the property department, where they inventoried Jehovah's property and completed a set of inventory forms.

Shortly after Jehovah arrived at Augusta Correctional Center on June 28, 2013, he received the property items from the free box transferred with him, along with inventory sheets for that box and for four additional boxes of his property still at Sussex II. The inventory sheets indicated that Turner and Webb had not followed Jehovah's direction to include certain books, legal and religious materials, and medical records in the free box. Jehovah sent multiple written requests to Augusta staff, stating his indigency and asking for a shipping cost loan to have his four boxes of property, which together weighed 320 pounds, sent to him immediately from Sussex II. On July 3, 2013, however, Jehovah received a $300 money order from his mother, Joyce Antonio, which Augusta officials credited to his trust account. As such, he was no longer indigent and did not qualify for a shipping loan.

Jehovah then wrote a request to ACC staff to use his new funds to pay the shipping costs for his property boxes. Staff refused to process this request. They told Jehovah to check his account statements, because the shipping costs should

have been deducted from his account at Sussex II, before officers there transferred his funds to Augusta.

Around this same time, Jehovah also asked his mother to contact Sussex II officials to see if she could pay them the shipping costs for sending his property boxes to Augusta. After Jehovah's previous prison transfers, she had been allowed to do so. Sussex II officials told Mrs. Antonio, however, that these boxes of Jehovah's property were in excess of the property items he was authorized to possess, which Jehovah denies. Staff members warned Mrs. Antonio that the items would be destroyed after July 27, 2013, unless someone picked up the items or paid for mailing them to a non-VDOC location. Knowing that Jehovah would not want the items destroyed, Mrs. Antonio picked up the boxes from Sussex II on July 19, 2014. Without prior approval by Jehovah, Sussex II staff altered the property disposition form Jehovah had signed to have his boxes shipped, to indicate that they had released the property to Mrs. Antonio.

Getting the items back to Jehovah thereafter proved difficult. VDOC regulations prohibit inmates from receiving boxes of property items or books from family or friends. Incoming mail is limited to one ounce per envelope — the weight of approximately five sheets of paper, at the cost of one first-class stamp. Mrs. Antonio estimates that at current postal rates, mailing Jehovah's thousands of pages of documents to him, five pages per envelope, would cost her nearly $2,000.

B. Access to Courts.

Jehovah alleges that being without the legal materials included in his "lost" boxes of property has hampered his numerous litigation efforts.[1] He also complains that various prison policies and practices interfere with his legal work. Among other things, he complains that (a) policy requires him to have less than five dollars and no income in order to receive free postage for legal mail; (b) inmates must wait two weeks or more for an appointment with the institutional attorneys, who are allowed to provide only limited assistance, and telephone calls to these attorneys are expensive and rare; (c) law libraries at different VDOC prisons have poorly trained staff, differing legal resources, sometimes incompatible computer software or hardware,[2] and varying numbers of computers and inmate law clerks to assist inmates; (d) deficient policies regarding law library scheduling and photocopy and computer printout production cause long delays and do not

---

[1] Jehovah offers a list of motions he wished to file, including appeal briefs and motions seeking to reopen closed civil actions, as well as new civil actions he wished to file. He complains that the loss of case file documents and discovery responses hampered his ability to litigate in the closed cases, and redrafting of pleadings delayed his submission of new civil actions.

[2] Jehovah alleges that in April 2014, when he was transferred from Augusta, law library staff saved the legal pleadings he was drafting to a CD-ROM disc for him to take along to the next prison facility. When he arrived at Deep Meadow Correctional Center, however, officials confiscated Jehovah's CD-ROM disc as unapproved. They have also refused to return this disc to Jehovah because Deep Meadow does not have a compatible computer system for inmates to use for legal work. Jehovah states that as a result of this confiscation, he has had to redraft the pleadings for civil rights actions he is preparing to file.

-5-

Case 7:14-cv-00538-JPJ-RSB   Document 17   Filed 05/11/15   Page 5 of 20   Pageid#: 571

provide sufficient priority for those facing court deadlines; (e) penalties for skipping school or work to use the law library discourage court access; (f) weather- or holiday-related cancelations of scheduled visits to the law library or institutional attorneys interfere with inmates' court access; (g) VDOC's prohibition of inmate-to-inmate correspondence hampers collection of affidavit evidence and inmates' helping each other with legal matters; (h) some officials refuse to allow an inmate to take his own legal materials to a court hearing; (i) restrictions on the number of pages inmates can receive in one envelope hampers their ability to receive copies of statutes, case law, or other legal reference materials and increases the costs of their litigation; (j) a policy against attorneys delivering or faxing legal materials to inmates directly has similar adverse effects; and (k) giving inmate law clerks control over other inmates' access to legal materials permits extortion, discrimination, and sabotage of inmates' legal efforts.

### C. Jehovah's Claims.

Based on these voluminous allegations, Jehovah sues three VDOC administrators, sixteen other VDOC employees at three prison facilities, and his mother, Mrs. Antonio. He asserts the following § 1983 claims: unreasonable seizure of property in violation of the Fourth Amendment, substantive and procedural due process and equal protection violations of the Fourteenth Amendment, denial of access to courts, conspiracy to violate constitutional rights,

and supervisory liability. He also asserts numerous claims under state law: detinue, trespass to chattels, wrongful conversion, intentional and/or negligent infliction of emotional distress, gross negligence and/or willful and wanton negligence, negligent supervision, and breach of contract. As relief, Jehovah seeks return of his property items and/or compensatory and punitive damages from VDOC defendants totaling $55,000. Jehovah also seeks injunctive relief directing VDOC officials to make specific changes to policies governing inmates' personal property and services related to inmates' litigation efforts.

## II.

### A. Misjoinder of Claims and Defendants.

The present Complaint is not consistent with Rules 18 and 20 of the Federal Rules of Civil Procedure, regarding joinder of claims and parties. Rule 18(a) only allows a plaintiff to join either "as independent or alternative claims, as many claims as it has against an opposing party." Rule 20 allows the joinder of several parties only if the claims arose out of the same transaction or occurrence, or series thereof, and contain a question of fact or law common to all the defendants. *See* 6A Charles Alan Wright, et al., *Federal Practice and Procedure* § 1583 (3d ed. 1998) (noting that, under Rules 18(a) and 20, if the claims arise out of different transactions and do not involve all defendants, joinder should not be allowed). Under these rules, "a plaintiff may name more than one defendant in a multiple

-7-

Case 7:14-cv-00538-JPJ-RSB   Document 17   Filed 05/11/15   Page 7 of 20   Pageid#: 573

claim lawsuit only if the claims against all defendants arose out of the same incident or incidents and involve a common factual or legal question." *Green v. Denning*, No. 06-3298-SAC, 2009 WL 484457, at *2 (D. Kan. Feb. 26, 2009). These procedural rules apply with equal force to pro se prisoner cases. Indeed, "[r]equiring adherence in prisoner suits to the federal rules regarding joinder of parties and claims prevents 'the sort of morass [a multiple claim, multiple defendant] suit produce[s].'" *Id.* (quoting *George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007)).

I cannot allow Jehovah's Complaint to proceed as it is presently constituted, because it improperly joins together multiple claims and defendants, regarding unrelated incidents in different time periods at different locations, in a manner entirely inconsistent with the rules. Because I find that Jehovah's Complaint also fails to state any claim of constitutional significance, however, I will summarily dismiss his federal claims on that ground, pursuant to 28 U.S.C. § 1915(e)(2)(b). I will also decline to exercise supplemental jurisdiction over his state law claims, pursuant to 28 U.S.C. § 1367(c), and dismiss them without prejudice.

Under 28 U.S.C. § 1915(e)(2), which governs in forma pauperis proceedings, the court has a mandatory duty to screen initial filings. *Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 656-57 (4th Cir. 2006). Specifically, "a district court must dismiss an action that the court finds to be frivolous or malicious or that

-8-

Case 7:14-cv-00538-JPJ-RSB   Document 17   Filed 05/11/15   Page 8 of 20   Pageid#: 574

fails to state a claim." *Michau v. Charleston Cnty., S.C.*, 434 F.3d 725, 728 (4th Cir. 2006) (citing 28 U.S.C. § 1915(e)(2)(B)).

The language of § 1915(e)(2), "accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless." *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) (interpreting prior version, designated as § 1915(d)). In reviewing the case under § 1915(e)(2), as with a motion under Rule 12(b)(6), the court must accept allegations in the complaint as true and draw all reasonable factual inferences in the plaintiff's favor. *See De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003). The factual allegations in the complaint must contain "more than labels and conclusions" and "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## B.  No State Action.

As an initial matter, Jehovah cannot pursue any § 1983 claim against his mother, Ms. Antonio. Only persons acting under color of state law may be sued under § 1983 for constitutional violations. 42 U.S.C. § 1983. Ms. Antonio is not a state employee, and I cannot find any respect in which Ms. Antonio's actions, in accepting possession of Jehovah's property from prison officials, may be fairly attributed to the state. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982).

Therefore, I conclude that she is not subject to suit under § 1983 for any alleged violation of Jehovah's constitutional rights.

### C. Personal Property Claims.

Jehovah's constitutional claims concerning the loss of access to his personal property items are legally frivolous.³ As an inmate, he simply does not have the same rights to protection or possession of his personal property that he enjoyed as a free citizen.

First, Jehovah has no claim under the Fourth Amendment's protection against unreasonable searches and seizures based on his allegation that prison officials deprived him of personal property he possessed in his cell. *See Hudson v. Palmer*, 468 U.S. 517, 526 (1984). Jehovah simply has no expectation of privacy in his cell or its contents, and thus cannot rely on the Fourth Amendment to seek to recover the value of property taken from his cell and lost or destroyed through the actions of prison officials. *Id.* at 528 n.8.

---

³ Although I will address each constitutional claim Jehovah has asserted, there is a strong argument that Jehovah has not been deprived of any property items. Ms. Antonio has not destroyed the property and appears willing to preserve it for Jehovah until his release and return it to him. He can ask her to mail many of the paper items to him in five-page increments. Thus, at the most, Jehovah's access to his property items has been limited under prison security regulations.

-10-

Second, Jehovah has no procedural due process claim concerning the alleged deprivation of his property.[4]  "Because the protections of the Due Process Clause are not triggered by the 'mere failure to take reasonable care,' negligent deprivations are not actionable under § 1983." *Lovelace v. Lee*, 472 F.3d 174, 202 (4th Cir. 2006) (quoting *Pink v. Lester*, 52 F.3d 73, 75 (4th Cir. 1995)); *see also Daniels v. Williams*, 474 U.S. 327, 328 (1986) ("[T]he Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property.").  Thus, to the extent that prison officials' negligent or inadvertent acts caused Jehovah's loss of his property, he has not suffered a deprivation of constitutional significance that triggered any federally required procedural protections.

Similarly, "an unauthorized *intentional* deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson*, 468 U.S. at 533.  During Jehovah's grievance proceedings about his property, a prison administrator found that

---

[4]  Jehovah also asserts that the defendants' conduct violated his substantive due process rights.  He offers no authority for a substantive due process claim, however, and I find none.  The language of the Due Process Clause itself must be the source of a substantive due process claim.  *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989).  I find nothing in that provision guaranteeing that an inmate may keep more than 320 pounds of personal property with him when he is transferred from one prison facility to another or that he must be reimbursed for the monetary value at which he assesses such property, if he is no longer allowed access to it.

-11-

officials did not follow prison regulations when they changed Jehovah's property disposition form after he signed it, in order to release his property to his mother. Such a random, unauthorized act violated Jehovah's procedural due process rights only if he had no meaningful postdeprivation remedy for the loss.

Jehovah has not been deprived of all his property items, because his mother can send him many of them through the mail. To the extent that he was actually deprived of some items, however, he possessed remedies under Virginia state law to seek recovery of his property or reimbursement for the value of his items. *See*, *e.g.*, Va. Code Ann. § 8.01-195.3 (Virginia Tort Claims Act). Thus, it is clear that he cannot prevail in a constitutional claim for the alleged loss of his property items. *Hudson*, 468 U.S. at 535-36 (regarding the availability and adequacy of state court remedies under Virginia law for alleged destruction of property).

Third, to the extent that Jehovah faults prison officials for violating prison regulations or other state laws, § 1983 is not the proper legal remedy. "[I]t is well settled that violations of state law cannot provide the basis for a due process claim." *Weller v. Dep't of Social Servs. for City of Balt.*, 901 F.2d 387, 392 (4th Cir. 1990). Similarly, a state's failure to abide by its own procedural regulations is not a federal due process issue and is not actionable under § 1983. *Riccio v. Cnty. of Fairfax, Va.*, 907 F.2d 1459, 1469 (4th Cir.1990). Thus, Jehovah's frustrations that prison officials failed to comply with or promptly execute prison regulations

regarding transportation, mailing, classification, and disposition of his property do not provide a basis for any claim under § 1983.

Fourth, Jehovah's property problems do not implicate the Equal Protection Clause of the Fourteenth Amendment. "To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *See Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). Jehovah submits no facts to support either of these facets of his claim. His equal protection argument is, essentially, that by failing to follow prison regulations concerning inmates' personal property, officials treated Jehovah differently than other inmates. I find no evidence that officials made state procedural errors in Jehovah's case as a result of intentional or purposeful discrimination. Moreover, violations of state law are not actionable under § 1983. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) ("Section 1983 was intended to protect only federal rights guaranteed by federal law"). Jehovah cannot transform a state law violation into a constitutional claim merely by calling it discrimination with no facts in support.

### C. Court Access Claims.

"[T]he fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal

-13-

papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law," *Bounds v. Smith*, 430 U.S. 817, 828 (1977). Such legal assistance programs are constitutionally sufficient if they provide inmates the "capability of bringing contemplated challenges to sentences or conditions of confinement before the courts." *Lewis v. Casey*, 518 U.S. 343, 356 (1996). More specifically, such programs should be "adequate to permit an inmate to explore possible theories of relief, determine the facts that must be present to make out claims under any available theories, and to frame pleadings before the federal or state courts should he wish to do so." *Strickler v. Waters*, 989 F.2d 1375, 1386 (4th Cir. 1993).

On the other hand, the right of access does not require prisons to provide an inmate litigant with every type of legal material that he believes necessary for his litigation. *Lewis*, 518 U.S. at 354-356. Moreover, prison officials may impose restrictions on inmates' access to available legal materials and services, so long as those restrictions are reasonably related to penological interests.[5] *Id.* at 361.

---

[5] It is inevitable that prison restrictions may cause inmates to experience delays in receiving legal materials or limits on the time or locations allowed for performing legal research or drafting pleadings. Where such regulations are reasonably related to legitimate penological interests, however, resulting delays or limitations "are not of constitutional significance, even where they result in actual injury" to the inmate's litigation efforts. *Id*. at 362.

Most importantly, an inmate's merely theoretical assertions about a legal assistance program's deficiencies cannot support a constitutional claim of denial of access. *Id.* at 351. Rather, the inmate must identify deficiencies in the legal assistance or materials available and show how they resulted in specific harm to his litigation of a particular nonfrivolous claim, or will do so in the future.[6] *Id.* at 351-53; *Christopher v. Harbury*, 536 U.S. 403, 415-16 (2002).

The inmate must show injury — that a pleading "he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities" prevented him from learning or "that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint." *Lewis*, 518 U.S. at 351. Vague and conclusory allegations about mere delays or inconveniences to an inmate's legal work cannot support a denial of access claim. *Strickler*, 989 F.2d at 1383.

Jehovah's first access claim alleges that defendants' handling of his 320 pounds of personal property deprived him of his right to access the courts. His lengthy complaint, however, does not identify any respect in which this incident prevented him from pursuing any specific, non-frivolous claim. He does not allege

---

[6] Even where an inmate's access to courts claim asserts that legal assistance deficiencies create roadblocks to future litigation, he must identify a "nonfrivolous," "arguable" underlying claim. *Lewis*, 518 U.S. at 353.

-15-

that any pending civil action related to those property items was dismissed because he lost easy access to that property. At the most, having to ask his mother to find and send him specific items from that property is an inconvenience that may create some delay and expense. Such minor difficulties cannot qualify as impediments of constitutional significance. Moreover, the record indicates that prison officials released his boxes to his mother in an attempt to prevent their destruction as excessive property under prison policies. If this motive was based on a misinterpretation of the policies, then the officials' actions were merely negligent, and thus, do not support any constitutional claim of denial of access. *See Pink*, 52 F.3d at 75 (citing *Daniel*, 474 U.S. at 330-32).

The remainder of Jehovah's complaints about defendants' alleged interference with his right to access also fails to state any claim of constitutional proportions. He does not state with any particularity any past claim that he was unable to discover or pursue, or any past complaint or petition that was dismissed on a technicality, as a result of the alleged shortcomings he identifies in the prisons' existing policies, legal materials, and equipment. He also fails to show how the challenged policies will prevent him from pursuing any particular, nonfrivolous claim that he intends to bring in the future.

At the most, Jehovah's complaint lists a myriad of ways in which he believes prison policies could be altered to eliminate some delays and

-16-

inconveniences or improve his ability to prepare legal pleadings. Such minor impairments to his litigating capacity are "simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Lewis*, 518 U.S. at 355. In addition, the policies' alleged adverse effects on Jehovah's litigation efforts are not actionable under § 1983, until Jehovah alleges facts on which he could base a plausible claim that those policies are not rationally related to legitimate penological interests. He has made no such showing.

### D. Conspiracy and Supervisory Lilability.

Jehovah's claims of conspiracy to commit constitutional violations related to his property rights and supervisory liability for such violations are doubly without merit. First, he offers nothing more than conclusory allegations in support of these claims. He states no specific facts showing that the defendants reached any agreement to violate his constitutional rights as required to prove a conspiracy claim under § 1983. *See Brown v. Angelone*, 938 F. Supp. 340, 346 (W.D. Va. 1996). He also fails to state facts showing how any of the supervisory officials were personally involved in any of the violations he alleges, and they cannot be held liable under § 1983 merely for being supervisors. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977). More importantly, Jehovah has not demonstrated that his constitutional rights were violated or will be violated in the future by the

actions and policies of which he complains. There can be no conspiracy or supervisory liability under § 1983 without a viable constitutional claim at stake.

E. State Law Claims.

Jehovah asserts a multitude of claims under state law, related to his property and access claims. These claims are not independently actionable under § 1983. *See Wright*, 766 F.2d at 849. Because I find that Jehovah's allegations do not provide a basis for any § 1983 claim, I will decline to exercise supplemental jurisdiction over his state law claims, pursuant to 28 U.S.C. § 1367(c)(3), and dismiss these claims without prejudice.

III.

In conclusion, for the reasons stated, I find that Jehovah's Complaint fails to provide a factual or legal basis for any claim of deprivation of constitutional rights. Therefore, I will dismiss his § 1983 claims without prejudice under § 1915(e)(2)(B)(1) as frivolous. I will also decline to exercise supplemental jurisdiction over his state law claims, pursuant to 28 U.S.C. § 1367(c)(3), and dismiss these claims without prejudice.

A separate Order will be entered herewith.[7]

---

[7] Long after submitting his original, lengthy Complaint, Jehovah now submits motions seeking leave to replace that Complaint with a First Amended Complaint with exhibits. Review of this submission reflects that Jehovah seeks to add: (a) facts about the alleged shortcomings of VDOC policies affecting inmates' access to the institutional attorneys; and (b) new, religious rights claims arising from the deprivation of his property

boxes, under the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA").

To amend his pleading in a pending civil action that has not been served on the defendants, a plaintiff must obtain leave of court. Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." *Id.* Because I conclude that Jehovah's original, unserved Complaint must be summarily dismissed as frivolous, I do not find that the interests of justice require allowing him to amend. Therefore, I will deny his motions seeking to do so.

In any event, the proposed amended complaint is also factually and legally frivolous. It does not correct any of the deficiencies on which I find Jehovah's claims in the original complaint to be frivolous. In addition, his new allegations in support of the proposed religious rights claims do not provide a factual basis for any federal claim.

In brief, Jehovah alleges that the property boxes now at his mother's house contain several books or written materials that he previously used extensively in the practice of his religious beliefs. Deprivation of an inmate's religious materials implicates his rights under the First Amendment or RLUIPA only if he shows how that deprivation substantially burdened his religious exercise. *See, e.g.,* 42 U.S.C. § 2000cc-2(b); *Lovelace v. Lee*, 472 F.3d 174, 185-87 (4th Cir. 2006). Jehovah makes no such showing. *See id.* at 187 ("[A] substantial burden on religious exercise occurs when a state or local government . . . put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.") (internal quotation marks and citation omitted). A burden that is merely an "inconvenience on religious exercise," such as Jehovah's frustration at not being able to read a particular copy of a book or having to pay postage to obtain copies of items he has written, is not substantial for purposes of a constitutional or RLUIPA claim. *Konikov v. Orange Cnty., Fla.* 410 F.3d 1317, 1323 (11th Cir. 2005). Moreover, RLUIPA and the First Amendment do not protect Jehovah from inadvertent or negligent actions that complicate his religious practice. *Lovelace*, 472 F.3d. at 194.

For the reasons stated, even if I allowed Jehovah to pursue his First Amended Complaint, I would summarily dismiss it under § 1915(e)(2)(b). It, like the Complaint itself, fails to provide a factual or legal basis for any federal claim and is, therefore, frivolous.

DATED: May 11, 2015

/s/  James P. Jones
United States District Judge